**LITE DEPALMA GREENBERG LLC**
Joseph J. DePalma
570 Broad Street, Suite 1201
Newark, New Jersey 07102
Telephone: (973) 623-3000
Facsimile: (973) 623-0858
jdepalma@litedepalma.com
*Attorneys for Plaintiff*
[Additional counsel on signature page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ELYSEE NICOLAS, Individually and as representative of a class of participants and beneficiaries on behalf of the Princeton University 403(b) Plan,<br><br>       Plaintiff,<br><br>vs.<br><br>THE TRUSTEES OF PRINCETON UNIVERSITY,<br><br>       Defendant. | Civil Action No. 2:17-cv-3695<br><br>**COMPLAINT – CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

1.      Plaintiff Elysee Nicolas, individually and as representative of a class of participants and beneficiaries of the Princeton University Retirement Plan ("Retirement Plan") and the Princeton University Retirement Savings Plan (the "Savings Plan") (collectively, the "Plans") brings this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plan against Defendant The Trustees of Princeton University (formerly known as Princeton University and referred to herein as the "University " or "Defendant") for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461 ("ERISA").

2.      The duties of loyalty and prudence are "the highest known to the law" and require

fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, Defendant is obligated to act for the exclusive benefit of participants and beneficiaries, and to ensure that the Plans' expenses are reasonable and the Plans' investments are prudent. Because the marketplace for retirement plan services is established and competitive, and because the Plan has billions of dollars in assets, the Plans haves tremendous bargaining power to demand low-cost administrative and investment management services and well-performing investment funds. But instead of leveraging the Plans' massive bargaining power to benefit participants and beneficiaries, Defendant failed to investigate, examine and understand the real cost to Plans' participants for administrative services, thereby causing the Plans to pay unreasonable and excessive fees for investment and administrative services. Defendant caused Plaintiff to pay an asset-based fee for administrative services that increased as the value of his participant account rose, even though no additional services were being provided. Further, Defendant selected and retained investment options for the Plans that historically and consistently underperformed their benchmarks and charged excessive investment management fees, as well as share classes that were more expensive than other share classes readily available to qualified retirement plans that provided Plan investors with the identical investment at a lower cost.

3.     Defendant was responsible for regularly monitoring all the Plans' investment choices and for periodically reviewing and evaluating the entire investment choice menu to determine whether it provided an appropriate range of investment choices into which participants could direct the investment of their accounts.  Defendant, however, failed in those duties.

4.     Defendant selected as the Plans' principal capital preservation fund an insurance company fixed-income account, the Teachers Insurance and Annuity Association of America and

College Retirement Equities Fund ("TIAA-CREF"), TIAA Traditional Annuity, that prohibits participants from re-directing their investment in the Traditional Annuity into other investment choices during employment except in ten annual installments, effectively denying participants the ability to invest in equity funds and other investments as market conditions or participants' investment objectives change. The Traditional Annuity also prohibits participants from receiving a lump sum distribution of the amount invested in the Traditional Annuity unless they pay a 2.5% surrender charge that bears no relationship to any reasonable risk or expense to which the fund is subject.

5.      One could reasonably infer from these circumstances alone that the Defendant's fiduciary decision-making process was either flawed or badly executed, but there is substantial additional evidence of a flawed process, such as incorrect reporting on the participant fee disclosure prepared by TIAA of expense ratios for the available Vanguard funds, making many of those funds appear more expensive than they really were.

6.      To remedy these fiduciary breaches, Plaintiff, individually and as representative of a class of participants and beneficiaries in the Plans, brings this action on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendant's liability under 29 U.S.C. §1109(a) to restore to the Plans all losses resulting from each breach of fiduciary duty. In addition, Plaintiff seeks such other equitable or remedial relief for the Plans as the Court may deem appropriate.

## JURISDICTION AND VENUE

7.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

8.      This judicial District is the proper venue for this action under 29 U.S.C.

683363.1

§1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plans are administered, where at least one of the alleged breaches took place and where the Defendant resides.

## THE PRINCETON UNIVERSITY RETIREMENT PLAN AND RETIREMENT SAVINGS PLAN

9.      The Plans are defined contribution, individual account, employee pension benefit plans under 29 U.S.C. §1002(2)(A) and §1002(34).

10.     The Plans are established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

11.     Eligible faculty and staff members of Princeton University are able to participate in the Plans. The Plans provides the primary source of retirement income for many employees of Princeton.  The Savings Plan, is based upon deferrals of employee compensation and employer matching contributions.   All contributions to the Retirement Plan are made by Princeton University.  The ultimate retirement benefit provided to participants depends on the performance of investment options chosen for the Plans by the Princeton University Benefits Committee net of fees and expenses.   Participants have the right to direct the investment of their accounts among the available investment choices

12.      The Plans are one of the largest defined contribution plans in the United States. Plans of such great size are commonly referred to as "jumbo plans."

### PARTIES

### Plaintiff

13.     Plaintiff is a participant in the Plans under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plans.  Through the Plans he is invested in the TIAA Traditional Annuity, The TIAA-CREF Stock Account R3, the CREF Bond Market Account R3, the TIAA Real Estate Account, the TIAA-CREF Inflation-Linked

683363.1

Bond Fund R3 and the TIAA-CREF Money Market Account R3.

**Defendant**

14.     The Trustees of Princeton University is a private, not-for-profit, nonsectarian institution of higher learning non-profit educational institution with its principal place of business in Princeton, New Jersey. The University is governed by a Board of Trustees.

15.     The University is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i), and upon information and belief, with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it properly to carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

16.     The University is a fiduciary to the Plans because it exercised discretionary authority or discretionary control respecting the management of the Plans or exercised authority or control respecting the management or disposition of its assets, and has discretionary authority or discretionary responsibility in the administration of the Plans. 29 U.S.C. §1002(21)(A)(i) and (iii).

**FACTS APPLICABLE TO ALL COUNTS**

**I.      Plan investments**

17.     Defendant exercised and continues to exercise discretionary authority over the investment options that are included in the Plans. The Plans' investments are designated by Defendant as available investment alternatives offered under the Plans.

18.     The Plans offers various investments managed by TIAA-CREF, including

annuities and investment funds.   The Plans also offer more than forty investment choices managed by The Vanguard Group and/or Vanguard Fiduciary Trust Company ("Vanguard"), which are all mutual funds.

19.     The TIAA Traditional Annuity offered in the Plans is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

20.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plans. For example, for participants who invest in the TIAA Traditional Annuity through a Group Retirement Annuity (GRA) contract, like the one held in the Plans, lump-sum withdrawals are available from the only within 120 days after termination of employment and they are subject to a 2.5% surrender charge. All other withdrawals and transfers from the participant's account must be paid in ten annual installments.  Rather than making funds available to participants if they wish to liquidate all or a portion of their accounts earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a ten-year period, unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years.

21.     The  CREF Stock Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Account and CREF Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's

- 6 -

investment in these variable annuities changes over time based on investment performance and expenses of the accounts.

22.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges.  For the R1 share class, which was the only share class available prior to 2015, those expenses consisted of the following:

a. "administrative expense" charge (39.5 bps); [1]

b. "distribution expense" charge (16.5 bps);

c. "mortality and expense risk" charge (0.5 bps); and

d. "investment management expense" charge (ranging from 4 to 15 bps).

23.     The TIAA Real Estate Account is an insurance company separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2016, these charges consisted of the following:

a. "administrative expense" charge (26.5 bps);

b. "distribution expense" charge (12.5 bps);

c. "mortality and expense risk" charge (0.5 bps);

d. "liquidity guarantee "(17 bps); and

e. "investment management expense" charge (32 bps).

24.     The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds

---

[1] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

II.     **Defendant's actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.**

25.     Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to jumbo defined contribution plans, like the Plan. Recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price.

26.     To ensure that plan administrative and recordkeeping expenses are and remain reasonable for the services provided, prudent fiduciaries of large defined contribution plans solicit competitive bids for the plan's recordkeeping and administrative services at regular intervals of approximately five years.

27.     The cost of recordkeeping and administrative services depends on the number of participants.  The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. Thus, the cost of providing recordkeeping services to a plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

28.     Jumbo defined contribution plans, like the Plans, possess tremendous economies

- 8 -

of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants.

29.     A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper, putatively for providing recordkeeping and administrative services for the investment. Because revenue sharing arrangements provide asset-based compensation for the recordkeeper, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee. Because revenue sharing payments are asset-based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to have their high-priced funds included as plan investment options.

30.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

31.     According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA

Retirement Research, 403(b) Plan Sponsor Research (2013).[2]

32.      It is well known in the defined contribution industry that plans with dozens of

choices and multiple recordkeepers "fail" based on two primary flaws:

> **1. The choices are overwhelming**. Numerous studies have demonstrated that
> when people are given too many choices of anything, they lose confidence or make
> no decision.

> **2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to
> leverage total plan assets and receive appropriate pricing based on aggregate
> assets.

The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov.

2009)(emphasis in original).[3]

33.      The benefits of using a single recordkeeper are clear:

> By selecting a single recordkeeper, plan sponsors can enhance their purchasing
> power and negotiate lower, transparent investment fees for participants.
> Participants will benefit from a more manageable number of institutional-quality
> investment options to choose from. Participants will also benefit from customized
> and consistent enrollment, education and ongoing communication materials.[4]

34.      In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually,

and What Can Be Done to Fix It", Aon Hewitt similarly recognized:

> 403(b) plan sponsors can dramatically reduce participant-borne costs while improving
> employees' retirement readiness by:

> – Reducing the number of investment options, utilizing an "open architecture"
> investment menu, and packaging the options within a "tiered" structure.

> – Consolidating recordkeepers to improve efficiencies and reduce compliance-
> related risks.

> – Leveraging aggregate plan size and scale to negotiate competitive pricing.

---

[2] Available at
http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/New
s_Center/Reports/130329-01exec.pdf.
[3] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.
[4] *5Id.*

AonHewitt, *How 403(b) Plans are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[5]

35.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

> high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight . . . . Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[6]

36.     Others in the industry agree. *See, e.g.*, Kristen Heinzinger, Paring Down Providers: A 403(b) Sponsor's Experience, PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[7] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010)(identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[8]  Use of a

---

[5] 6Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[6] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

[7] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[8] Available at

single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plans. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[9]

37.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendant continues to contract with *two* recordkeepers (TIAA-CREF and Vanguard). The inefficient and costly structure maintained by Defendant has caused Plan participants to pay and continue to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There is no loyal or prudent reason for Defendant's failure to engage in a process to reduce duplicative services and the fees charged to the Plan or to continue with two recordkeepers to the present.

38.    Each of the Plans' recordkeepers received or currently receives compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plans and their investments for providing these duplicative services.

39.    Upon information and belief and according to industry experts and the prospectus for the CREF Retirement Equities Fund, which includes the eight CREF variable annuities, the

---

http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[9] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plans'

TIAA-CREF investments prior to 2015 were:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 56 bps |
| Premier share class of TIAA-CREF mutual funds | 15 bps |
| Retirement share class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 39 bps |
| TIAA Traditional Annuity | 15 bps |

40.     Vanguard is compensated for recordkeeping services based on internal revenue

sharing it receives from its proprietary mutual funds sold to the Plans.

41.     In addition, the Plans' recordkeepers receive additional indirect compensation,

including revenue sharing for non-proprietary funds, float, securities-lending revenue,

distribution fees, mortality and expense charges, surrender charges, spread and redemption fees.

42.     Based on information currently available to Plaintiff regarding the Plans' features,

the nature of the administrative services provided by the Plans' recordkeepers, the Plans'

participant level, and the recordkeeping market, benchmarking data indicates that a reasonable

recordkeeping fee for the Plans would have been a fixed amount between $500,000 and

$850,000 (approximately $35 per participant with an account balance).[10]

43.     An examination of the prospectuses for the TIAA and CREF funds available as

investment choices and the Plans' financial data, reveals that the Plans paid at least hundreds of

dollars per participant per year from 2010 to 2015 for recordkeeping; much higher than a

reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees

each year.

---

[10] Many of the 13,000 active and former employees who participate in the Retirement Plan are
also participants in the Savings Plan.

44.     In 2014, Princeton finally negotiated an arrangement in which TIAA would credit the Plans with an amount by which revenue sharing payments received in connection with the Plans' investment options exceeded a negotiated amount for recordkeeping expense.   As a result, the Retirement Plan received $674,000 in 2014 and $805,000 in 2015, and the Savings Plan got $388,000 in 2014 and $481,000 in 2015.

45.      Based on calculations derived from examination of the Plans' 5500's, TIAA received indirect compensation for recordkeeping and administrative services of $5.5 million from only the CREF variable annuities and the TIAA CREF Real Estate Account, without considering the revenue sharing from the TIAA Traditional Annuity with aggregate assets of $340 million.  Even after the $1.062 million aggregate "credit" received by the Plans in 2014, the Plans still paid more than $300 per participant for recordkeeping.

46.     In addition, the TIAA receives additional indirect compensation, including revenue sharing for non-proprietary funds, float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread and redemption fees.

47.     The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[11] Even if participants pay only 25 basis points in excessive fees over a thirty-five-year period, it would mean the difference between receiving 12 monthly benefit payments a year and eleven.

48.     Defendant also failed to control recordkeeping costs as Plan assets grew. From June 30, 2009 to June 30, 2015, the Plans' assets increased over 100%. Because revenue sharing

---

[11] 11 Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

payments are asset-based, the already excessive compensation paid to the Plans' recordkeepers became even more excessive as the Plans' assets grew, even though the administrative services provided to the Plans remained the same. Defendant could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plans as other loyally and prudently administered plans do, but failed to do so.

49.     A competitive bidding process for the Plans' recordkeeping services should have produced a more reasonable recordkeeping fee for the Plans. This competitive bidding process would have enabled Defendant to select a recordkeeper charging reasonable fees, obtain a substantial reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.   Considering the level of fees being paid by the Plans for recordkeeping, a reasonable person could conclude that the University did not employ a competitive bidding process, or if it did, did not act in a manner consistent with the results of that process.

50.     Defendant failed prudently to monitor and control the compensation paid by the Plans for recordkeeping and administrative services, particularly the asset-based revenue sharing received by the Plans' recordkeepers. Had Defendant monitored the compensation paid to the Plans' recordkeepers and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings in the last six years alone.

51.     Annual Returns on Form 5500 provide substantial evidence of that failure.  The Plans' 5500's are essentially the Plans' annual tax returns. Department of Labor ("DOL") rules expressly require that plan services providers report all direct and indirect compensation received for the year in connection with those services. .   None of the Plans' 5500's filed since 2010

683363.1

disclose any amount of indirect compensation being received by TIAA.  In fact, all of the 5500's for the Savings Plan affirmatively indicate that TIAA did not receive any direct or indirect compensation for recordkeeping services—a representation we know to be untrue by virtue of the revenue sharing calculations presented in paragraphs 40-42 above.  The 5500's for the Retirement Plan indicate that TIAA did receive direct compensation of $11,192 in 2014 and $16,593 in 2015, but otherwise did not receive any indirect compensation for recordkeeping services.  The 5500's for 2013 and earlier indicate affirmatively that TIAA did not receive any indirect compensation from the Retirement Plan; a position that is patently false.  Moreover, the financial statements attached to those earlier 5500's state that the administrative expenses of the Plan are paid by the University which, by necessary implication of the preceding sentence, is equally false.  Whether these egregious reporting errors were caused by TIAA's reporting deficiencies or by the University's misrepresentation of TIAA's accurate reporting, the implication is the same—Defendant failed in its obligations to the Plans and their participants.

52.     Further evidence is provided by the participant fee disclosure required by 29 CFR 2550.404(a)(5) to be delivered annually to each participant; a disclosure provided by TIAA.  Among other information, the disclosure must provide an historical record of the investment return for the fund as well as the "expense ratio," which is the aggregate expense investors pay for investing in the fund and stated in "basis points" as a percentage of the amount invested.  A basis point is one one-hundredth of one percent, so that an expense ratio of 50 basis points, for example, charges 0.5% as a fee for investing.

53.     As previously alleged, participants can choose to invest in the TIAA funds or in a variety of funds offered by Vanguard.  The participant fee disclosure includes investment return and expense information for the Vanguard funds as well as the TIAA funds. The reporting for

- 16 -

the Vanguard funds, however, does not appear to be accurate.  The following table provides a significant sample of the available Vanguard funds with their corresponding expense ratios as reported in the respective fund's prospectus and as reported by TIAA in a recent participant fee disclosure and differences in the reporting of from one to four basis points.

| Princeton University Retirement Plans— Vanguard Fund Reported Expense Ratios | | | |
|---|---|---|---|
| Fund | Expense from Prospectus (bps) | Expense Reported by TIAA (bps) | Differential |
| Convertible Securities Fund | 34 | 38 | 4 |
| PRIMECAP Adm | 33 | 34 | 1 |
| Explorer Fund | 34 | 35 | 1 |
| Growth Index Fund | 22 | 23 | 1 |
| Pacific Stock Index | 10 | 12 | 2 |
| European Stock Index | 10 | 12 | 2 |
| FTSE Social Index Fund | 22 | 25 | 3 |
| International Growth Fund Adm | 33 | 34 | 1 |
| International Value Fund Inv | 43 | 46 | 3 |
| STAR Fund | 32 | 34 | 2 |
| Morgan Growth Fund | 38 | 40 | 2 |
| Selected Value Fund | 35 | 39 | 4 |
| Vanguard Target Date Funds | 9 | 10 | 1 |
| Total Bond Market Index Fund | 16 | 20 | 4 |
| Total International Stock Index Fund | 9 | 10 | 1 |
| U.S. Growth Fund | 32 | 33 | 1 |
| Wellesley Income Fund | 22 | 23 | 1 |
| Windsor II Fund | 25 | 26 | 1 |

54.     This rather extensive reporting error demonstrates the cavalier attitude with which Defendant approached its fiduciary duty to give participants accurate information about plan investments. It should have been uncovered and corrected.

55.     But even worse, if it turns out that the participant fee disclosure is correct, that TIAA was padding the bill, and overcharging participants who chose the Vanguard funds over the TIAA funds, the Defendant would never know.

### V.     Defendant imprudently retained historically underperforming Plan investments.

56.     Given Defendant's failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plans.

#### a. CREF Stock Account

57.     Investments in the CREF Stock Account constitute more than 20 percent of the Plans' assets, and the CREF Stock Account has been included as an investment option in the Plans from 2011 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category.  In its Prospectus, the CREF Stock Account states that it "invests at least 80% of its assets in a broadly diversified portfolio of common stocks." This option has for years historically underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plans.

58.     TIAA-CREF imposed restrictive provisions on the specific annuities that must be provided in the Plans. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plans without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plans to drive very substantial amounts of revenue sharing payments to TIAA-

CREF for recordkeeping services. Prior to creation of three separate share classes for the CREF Stock Account in mid-2015, the CREF Stock Account paid 56 bps for revenue sharing as administrative expense and "distribution fees", which exceeded other TIAA-CREF investments by over 50% (15 bps).

59.     Defendant apparently failed to undertake a thorough analysis when it selected and retained the actively managed CREF Stock Account, and thereafter failed to adequately to monitor the fund and persistently ignored the readily available data of the fund's underperformance, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plans in order to drive revenue to TIAA-CREF. Defendant also provided the fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market, and active managers do not outperform passive managers net of fees in this investment style.

60.     Had Defendant conducted such an analysis, it would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

61.     Rather than performing poorly in a single year or two, the CREF Stock Account has performed worse, over a period of many years than both available lower-cost index funds and the index benchmark. In participant communications, Defendant and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style for the one-, five-, and ten-year periods ending December 31, 2014.[12] The passively managed index

---

[12] 18 Performance data provided as of December 31, 2014.

funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Pl) (VITPX) and the Vanguard Institutional Index (Inst Pl) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



62.    The CREF Stock Account, with an expense ratio of 70 bps during most of the relevant period, and dropping to 38 basis points in  2015, was and is dramatically more expensive than far better performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

63.    Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-

year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX).



64.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[13]

---

[13] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and



Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), was 5.89%.

683363.1





65.     Despite the consistent underperformance, the CREF Stock Account, with an

expense ratio of  70 bps during most of the relevant period, and dropping to 38 basis points in

2015, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity (Inv) (36 bps), and the Vanguard PRIMECAP (Adm) (33 bps).

66.     Reflecting the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, Aon Hewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. Aon Hewitt, TIAA-CREF Asset Management, INBRIEF, at 3 (July 2012).[14] This recommendation was due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id.* at 4–5.

67.     The Supreme Court recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendant failed to conduct a prudent process to monitor the CREF Stock Account and continues to retain the fund despite its continuing underperformance compared to lower-cost investment alternatives readily available to the Plans and the opinion of one of the foremost authorities in the retirement investment industry that ***no*** retirement plan should own this fund.

68.     Prudent fiduciaries of defined contribution plans are required to and do continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced

---

[14]     Available    at    http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plans.

69.     Had the Defendant removed the CREF Stock Account and the amounts been invested in any of the actively managed lower-cost alternatives or the passively managed lower-cost alternatives, as set forth in ¶¶97 and 99, Plan participants would not have lost millions of dollars' worth of their retirement savings.

**B.     TIAA Real Estate Account**

70.     Defendant selected and continues to offer the TIAA Real Estate Account as a real estate investment option in the Plans. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

71.     With an expense ratio of 88.5 bps as of December 31, 2015, the TIAA Real Estate Account charges excessive an unreasonable fees. It is also over 10 times more expensive than the Vanguard REIT Index (Inst) with an expense ratio of 8 bps.



 The TIAA Real Estate Account had a long history of substantial underperformance relative to the Vanguard REIT Index over the one-, five-, and ten-year periods ending December 31, 2009.[15] Despite this, Defendant selected and continues to retain it in the Plans.

_____

[15] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Inst) was 5.49%.

683363.1



72.     This underperformance occurred for years before 2009 and has continued afterward. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.[16]

---

[16] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plan's Form 5500 with the Department of Labor.



73.    The very design of the TIAA Real Estate Account creates such operational difficulties, and burdens investors in the fund with such significant additional expense, that a reasonable plan fiduciary should have questioned whether the fund was an appropriate investment at all for participant-directed individual account plans like the Plans.

74.    The TIAA Real Estate Account is an insurance company pooled separate account, meaning that all the assets held in the account are plan assets and all the transactions involving those assets are subject to the prohibited transaction rules of ERISA § 406. As a result, TIAA has had to obtain an individual prohibited transaction exemption from the Employee Benefit Security Administration of the DOL just to be able to offer the fund as an investment choice to ERISA

plans. One of the conditions of that exemption is that TIAA must retain the services of an independent fiduciary to review and approve nearly every transaction in which the fund engages, adding significant additional expense to the operation of the fund.

75.     Additionally, the fund invests directly in real property assets that are highly illiquid.  In order to manage the liquidity problem, TIAA guarantees the liquidity of participant accounts invested in the Real Estate Account, but charges participants an additional 17 basis points for that liquidity guarantee.

76.     The Real Estate Account charges participants 29.5 basis points for recordkeeping expense, whereas the R3 share classes of the variable annuities currently charge only 14.5 basis points.  A reasonable fiduciary would have questioned why, for a participant invested in the Real Estate Account, recordkeeping should cost double what it costs a participant invested in the variable annuities, and would have determined that there is no difference in cost, especially when all the accounting, appraisal and other costs associated with valuation are already being paid by the Real Estate Account.

77.     Finally, the Real Estate Account has and continues to charge 12.5 basis points for "distribution fees."  Any reasonable fiduciary would have questioned why TIAA is charging a distribution fee to distribute its own fund; this is a fee that gets paid to TIAA.  The fact that TIAA may require plans to include the Real Estate Account in a plan's menu of investment choices only adds insult to injury.

78.     The Real Estate Account's poor performance coupled with 44.5 basis points in excessive fees makes the TIAA Real Estate Account an exceedingly poor choice by any measure and speaks for itself in evaluating the performance of Defendant's fiduciary obligation to act solely in the best interest of participants for the exclusive purpose of providing them benefits

under the Plans.

79.    As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. Defendant failed to conduct such a process and continues to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

80.    Had Defendant removed the TIAA Real Estate Account and the amounts been invested in the lower-cost and better-performing Vanguard REIT Index, Plan participants would not have lost millions of dollars' worth of their retirement savings.

## ERISA'S FIDUCIARY STANDARDS

81.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant as fiduciary of the Plans. 29 U.S.C. §1104(a)(1), states, in relevant part, that:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)    for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan; [and]

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

82.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

83.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely

- 30 -

in the interest of participants in the plan.

84.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C.

§1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach

by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in

relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2)     if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

85.     29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for

appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

86.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of either of the

Plans to bring an action individually on behalf of the Plans to enforce a breaching fiduciary's

liability to the plan under 29 U.S.C. §1109(a).

87.     In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plans, as an alternative to direct individual actions on behalf of the Plans under 29 U.S.C. §1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plans. Plaintiff seeks to certify, and to be appointed as representatives of, the following class:

> All participants and beneficiaries of The Princeton University Retirement Plan and the Princeton University Retirement Savings Plan from May 24, 2011, through the date of judgment, excluding the Defendant or any participant who is a fiduciary to the Plans, excluding those individuals serving or who have served in a fiduciary capacity to the Plans, and the members of their immediate families.

88.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The Class includes over 24,000 members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to this Class because the Defendant owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plans and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plans breached their fiduciary duties to the Plans; what are the losses to the Plans resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendant's breach of duty.

c. Plaintiff's claims are typical of the claims of the Class because Plaintiff was a

- 32 -

participant during the time period at issue in this action and all participants in the Plans were harmed by Defendant's misconduct.

d. Plaintiff is an adequate representative of the Class because he was a participant in the Plans during the Class period, has no interest that is in conflict with the Class, is committed to the vigorous representation of the Class and has engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant in respect to the discharge of its fiduciary duties to the Plans and personal liability to the Plans under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

89.    A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiff is aware of no difficulties likely to be encountered in the management of this matter as a

class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

90.    Plaintiff's counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## COUNT I

### Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees

91.    Plaintiff restates and incorporates the allegations in the preceding paragraphs.

92.    The scope of the fiduciary duties and responsibilities of the Defendant includes discharging its duties with respect to the Plans solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, prudence, and diligence required by ERISA.  Defendant is directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

93.    Defendant selected and retained as the Plans' investment options investment funds and insurance company annuities that caused the Plans to incur far higher administrative fees and expenses relative to the size and complexity of the Plans.

94.    For years Defendant failed to engage in a prudent process for the evaluation and monitoring of amounts being charged for administrative expense, allowing the Plans to be charged an asset-based fee for recordkeeping calculated in a manner that was completely inconsistent with a reasonable fee for the service and was grossly excessive for the service being provided.

683363.1

95.     Had a prudent and loyal fiduciary conducted a process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable asset-based fees for fixed administrative services.

96.     Defendant's failure to properly evaluate the reasonableness of amounts being charged to the Plans have caused Plaintiff and the Class millions of dollars in direct economic loss.  The Plans' total losses will be determined after complete discovery in this case and are continuing.

97.      Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT II

### Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses

98.     Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

99.     Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plans, in accordance with 29 U.S.C. §1102(a). Defendant is the Plan Administrator under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for

- 35 -

the investment of their contributions and provision of their retirement income.

100.     Prudent fiduciary practice and investment policy would include (i) quarterly performance evaluation of each of the Plans' investment choices, including comparisons to a benchmark and to a peer group of alternative investments, (ii) putting funds that fell below acceptable standards for a period of consecutive quarters on a watch list, and replacement of a fund after persistent under-performance.  The performance of the CREF Stock Account and the TIAA Real Estate Account falls completely outside the guidelines of any reasonable investment policy.  The failure to take any affirmative action in light of historic performance and excessive expense could only have occurred in the absence of a prudent process.  And if Defendant had engaged in a prudent process, the failure to act in accordance with the obvious conclusion of that process, would be the definition of a breach of the duties of prudence and diligence.

101.     Defendant's failure to adequately evaluate the performance of the CREF Stock Account, the TIAA Real Estate Account, or their associated fees and expenses has caused Plaintiff and the Class millions of dollars in lost earnings. Total Plan losses will be determined after complete discovery in this case

102.     The scope of the fiduciary duties and responsibilities of the Defendant includes managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plans, and acting with the care, skill, diligence, and prudence required by ERISA. Defendant is directly responsible for ensuring that the Plans' fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plans' investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plans' assets are invested prudently.

103.     As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a

continuing duty to monitor investments and remove imprudent ones[.]" Tibble, 135 S. Ct. at 1829.

104.     Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plans' investment options were retained for reasons other than the best interest of the Plans and their participants, and were causing the Plans to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plans.

105.     Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plans any losses to the Plans resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## COUNT III

### Breach of Duties of Loyalty and Prudence --Failure to Monitor Fiduciaries and Service Providers

106.     Plaintiff restates and incorporates the allegations contained in the preceding paragraphs.

107.     Defendant is the named fiduciary with the overall responsibility for the control, management and administration of the Plans, in accordance with 29 U.S.C. §1102(a).  Defendant is the Plan Administrator of the Plans under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plans, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plans and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their

- 37 -

retirement income.

108.     Given that Defendant had the overall responsibility for the oversight of its plans, Defendant had a fiduciary responsibility to monitor the performance of the other fiduciaries and service providers, including those delegated fiduciary responsibility to administer and manage Plan assets.

109.     A monitoring fiduciary must ensure that its monitored fiduciaries and service providers are performing their obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

110.     Defendant breached its fiduciary monitoring duties by, among other things:

a.       Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plans suffered losses as a result of its appointees' imprudent actions and omissions with respect to the Plans;

b.       Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.       Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plans' administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plans' recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though

the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plans;

      d.     Failing to ensure that the monitored fiduciaries and service providers considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plans' mutual fund and insurance company variable annuity options; and

      e.     Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

    111.    Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plans, the Plaintiff, and the other Class members lost tens of millions of dollars of retirement savings.

## PRAYER FOR RELIEF

For these reasons, Plaintiff, on behalf of the Plans and all similarly situated Plan participants and beneficiaries, respectfully requests that the Court:

• Find and declare that the Defendant has breached its fiduciary duties as described above;

• Find and adjudge that Defendant is personally liable to make good to the Plans all losses to the Plans resulting from each breach of fiduciary duties, and to otherwise restore the Plans to the position they would have occupied but for the breaches of fiduciary duty;

• Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

• Order Defendant to provide all accountings necessary to determine the amounts Defendant must make good to the Plans under §1109(a);

• Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

• Surcharge against Defendant and in favor of the Plans all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

• Reform the Plans to include only prudent investments;

• Reform the Plans to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

• Certify the Class, appoint the Plaintiff as a class representative, and appoint Schneider Wallace Cottrell Konecky Wotkyns LLP, Lite DePalma Greenberg LLC, and Berger & Montague P.C. as Class Counsel;

• Award to the Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

• Order the payment of interest to the extent it is allowed by law; and

• Grant other equitable or remedial relief as the Court deems appropriate.

Dated: May 23, 2017      By:     */s/ Joseph J. DePalma*
                          Joseph J. DePalma
                          **LITE DEPALMA GREENBERG LLC**
                          570 Broad Street, Suite 1201
                          Newark, New Jersey 07102
                          Telephone: (973) 623-3000
                          Facsimile: (973) 623-0858
                          jdepalma@litedepalma.com

                          Garrett W. Wotkyns*
                          Michael McKay*
                          John J. Nestico*

683363.1

**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
8501 N. Scottsdale Road, Suite 270
Scottsdale, Arizona  85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
mmckay@schneiderwallace.com
jnestico@schneiderwallace.com

Todd Schneider*
**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
2000 Powell Street, Suite 1400
Emeryville, California  94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com

Todd S. Collins*
Shanon J. Carson*
Ellen T. Noteware*
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103-6365
tcollins@bm.net
scarson@bm.net
enoteware@bm.net

*Attorneys for Plaintiff*

*Pro Hac Vice application forthcoming